Yvonne G. TROUT, et al., Plaintiffs,

v.

John F. LEHMAN, Jr., et al., Defendants.

Civ. A. No. 73–0055.

United States District Court, District of Columbia.

Oct. 16, 1986.

Bradley G. McDonald, John F. Karl, Jr., McDonald & Karl, and James L. Lyons, Kellogg, Williams & Lyons, Washington, D.C., for plaintiffs.

Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

This case is before this Court once more following decisions by the Court of Appeals and the U.S. Supreme Court and a remand to this Court by the Supreme Court.

I

In *Trout v. Hidalgo,* 517 F.Supp. 873 (D.D.C.1981), this Court held that the plaintiff class [1] had established a *prima facie* case of sex discrimination, and that defendants had failed to rebut that *prima facie* case. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The Court's ruling rested primarily, but not exclusively, on the greater reliability of the plaintiffs' statistical evidence.

The Court of Appeals, while affirming the ultimate decision on liability, held that this Court's analysis of plaintiffs' and defendants' statistical evidence was erroneous in two respects. First, the Court of Appeals held that Title VII [2] liability could not properly be premised upon the continuing effects of discriminatory conduct occurring before March 24, 1972, when Title VII first became applicable to the federal government. Second, the court decided that defendants could not be held accountable for the salary and grade placements of their employees if those placements were predetermined by the employees' previous salary and grade placements at another federal agency. *Trout v. Lehman,* 702 F.2d 1094, 1103–05 (D.C.Cir.1983). Plaintiffs' principal statistical evidence (the Straszheim study) included data of both types, and the Court of Appeals deemed this Court's decision to be erroneous insofar as it considered these two types of data to be legally relevant. Despite these defects, however, the Court of Appeals determined that the Straszheim study created a "justifiable inference" of class-wide discrimination in promotion, *see* 702 F.2d at 1105, and that defendants had not rebutted this *prima facie* case. *See* 702 F.2d at 1105–06. This Court's finding of class-wide discrimination in promotion was accordingly affirmed while its finding of discrimination in initial grade placements was reversed. 702 F.2d at 1108.

1. Plaintiffs are a group of civilian female employees who worked at NAVCOSSACT (later NARDAC), the Navy's computer operations center, between June 6, 1972 and June 4, 1979. *See* 517 F.Supp. at 877.

2. 42 U.S.C. § 2000e *et seq.*

On certiorari, the Supreme Court held that this Court's finding on the ultimate issue of liability could not be upheld without a remand "for findings of fact, based on new evidence if necessary, on the question what evidentiary value respondents' and petitioners' statistical evidence has in light of the Court of Appeals' conclusions concerning [pre–1972 and outside agency discrimination]." *Lehman v. Trout,* 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984). The Court remanded the case here because it was "unsure whether the trial court would have found discrimination absent its erroneous understanding [of the law]." *Segar v. Smith,* 738 F.2d 1249, 1280 (D.C.Cir.1984). The case is here today in that posture. *See Pullman-Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982).

## II

Following the remand, defendants have moved to present additional statistical evidence that will, they contend, establish defendants' innocence of all charges of discrimination. Plaintiffs argue that additional evidence is not required, and that the Court should, once again, find defendants liable under Title VII on the basis of the present record.

This Court's task has been made considerably easier by the Supreme Court's recent decision in *Bazemore v. Friday,* —— U.S. ——, 106 S.Ct. 3000, 90 L.Ed.2d 315 (U.S.1986). The Court there implicitly disagreed with what appears to be the Court of Appeals' holding in this case that the continuing, post–1972 discriminatory effects of pre–1972 discrimination could not generate liability under Title VII. *Bazemore,* like the instant case, involved a regression analysis containing "salary figures which reflect the effect of pre-Act discrimination." 106 S.Ct. at 3007. The Supreme Court found the use of those salary figures to be proper, distinguishing between giving legal effect to pre–1972 activities—which is not allowed—and the permissible use of such activities to support findings of discrimination on the basis that the existing pay structure represents a mere continuation of an earlier, discriminatory structure. 106 S.Ct. 3007 n. 6. That is also the distinction which this Court sought to make when the present case was here for the first time. *See* 517 F.Supp. at 879–80, where the Court noted that "[a]lthough discriminatory conduct which occurred solely prior to March 24, 1972 is not directly actionable in Title VII suits ... evidence of such conduct can in some circumstances support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change [citing *Hazelwood* ]." In short, under *Bazemore,* the Straszheim study's use of similar data is now clearly acceptable.[3]

The Court of Appeals also reversed this Court's conclusion that defendants had the burden of showing that they lacked control over the initial grade placements of employees transferred from other agencies at predetermined grades and salaries. 702 F.2d at 1105. It is plain from the Court of Appeals decision that no class member may predicate liability on her initial grade and salary placement if that placement was made by an outside agency. Just as clearly, however, liability may be predicated upon the defendants' subsequent discriminatory promotion decisions. The question to be answered, then, is whether inclusion of data on initial placements in the Straszheim study fatally undercuts its evidentiary worth in the promotion context as well. The Court of Appeals believed that the plaintiffs' statistics "created a justifiable inference that the defendants had 'failed to

---

**3.** In any event, the Straszheim study could properly employ pre–1972 data whether or not the continuing effects of pre–1972 discrimination are actionable. The existence of discrimination before 1972 (itself not actionable) may, depending upon the circumstances, support an inference that actionable discrimination continued in the post–1972 period. *Hazelwood School District v. United States,* 433 U.S. 299, 309 n. 15, 97 S.Ct. 2736, 2742 n. 15, 53 L.Ed.2d 768 (1977). That type of inference played a role in this Court's initial findings of fact, *see* 517 F.Supp. at 879–80, and its probative force continues today.

promote equitably individuals who were discriminated against at hiring.'" 702 F.2d at 1105 (*quoting* 517 F.Supp. at 885). That was and is this Court's view of the evidence as well.

This Court's initial determination did not represent a holding that defendants could be found liable for grades and salaries predetermined by another agency. In fact, the Court took pains to note that "even if all authority for improper initial grade placement were assigned to rest with the Civil Service Commission, the resulting disparities in grade level remaining over several years could still be properly attributable to [defendants]" *inter alia* if they "failed to promote equitably individuals who were discriminated against at hiring." 517 F.Supp. at 885. The Straszheim study, it was found, "established a *prima facie* case of sex discrimination in initial grade placement *and promotion*." 517 F.Supp. at 884 (emphasis added).

■ The plaintiffs' prima facie case, which may be established by the Straszheim study alone, *see, e.g., Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Segar v. Smith*, 738 F.2d at 1278, was greatly reinforced by non-statistical evidence of discrimination:

> There was testimony from a number of present and former employees of NAR-DAC concerning various discriminatory practices, long after 1972, including a denial of supervisory opportunities to women, assignment of women to lower level positions, and the preselection of men for supervisory positions. The Court was especially impressed by the testimony of several former employees of the agency who were very credible witnesses and who related both specific instances and general impressions of discrimination against women at NARDAC. Some of these individuals left NARDAC for other federal employment and thereafter advanced to higher grades far more rapidly than had been possible at NAR-DAC.

517 F.Supp. at 887 (footnotes omitted). None of those findings is affected by either of the appellate decisions in this case. The Court has little hesitation, in view of the foregoing, in again concluding that plaintiffs have established a *prima facie* case of class-wide sex discrimination in promotions. The next question is whether the defendants should be given another opportunity to rebut that *prima facie* case.

### III

■ In reliance on the Supreme Court's remand instructions, defendants seek to introduce three new statistical analyses to supplement their previous rebuttal evidence. The Supreme Court ordered a remand "for findings of fact, based on new evidence *if necessary*" (emphasis added), on the question of the value of plaintiffs' and defendants' statistical evidence in light of the Court of Appeals' conclusions of law. Clearly, this Court is not required to reopen the evidence unless that step is needed for a fair reassessment of the record, taking account of the Court's earlier errors of law. Notwithstanding the "irresponsible" attempts of defendants to reopen this case in earlier proceedings, *see Trout v. Lehman*, 702 F.2d at 1106, this Court would not hesitate to hear new evidence if that were required to decide the legal questions presently before the Court. That, however, is not the case.

The Supreme Court's somewhat cryptic mandate can be viewed in one of two ways. First, the element of necessity can be considered from the point of view of fairness to defendants, that is, whether, in light of the change brought about by the Court of Appeals' holding on the law, it is necessary, in fairness, to permit defendants to reopen their case. But that hypothesis does not stand scrutiny. Plaintiffs' *prima facie* case has been rendered weaker, not stronger, by the Court of Appeals' ruling, and defendants' rebuttal evidence has, if anything, been strengthened by the appellate rulings.[4]

---

**4.** This is so if only because this Court in its

earlier ruling criticized defendants' statistical

Second, the Supreme Court's direction with respect to necessity can be applied here on the basis that, because of the weakening of plaintiffs' *prima facie* case, the evidence presented by the respective parties is now so closely balanced that the admission of additional evidence is required to permit a conclusion. However, for the reasons discussed elsewhere herein, that is not the situation. Indeed, plaintiffs' evidence still presents a strong *prima facie* case, and the receipt of additional evidence would therefore simply provide the defendants with yet an additional opportunity to make a record although they had ample opportunity, during a ten-day trial to do so. "At some point litigation must come to an end, even though it is always possible to offer more evidence." 702 F.2d at 1106.

Because the Court can fulfill completely the mandates of the appellate courts by reviewing the existing factual record, the admission of defendants' remand exhibits would be "insensitive to the extraordinary burdens faced by district courts already overloaded with heavy dockets, and wasteful of precious resources of litigants and the judiciary." *Id.*

### IV

The Court has weighed the rebuttal evidence adduced by defendants against plaintiffs' *prima facie* case, and it again concludes that defendants have not met their burden of articulating legitimate, nondiscriminatory reasons for the disparate treatment of male and female employees. *See U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell-Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). First, the single most important defect identified in defendants' statistical evidence—the use of a cohort analysis technique—is unaffected by the Court of Appeals' ruling. *See* 517 F.Supp. at 884–85; *see also, Segar v.*

*Smith,* 738 F.2d at 1286 ("[c]ourts have viewed cohort analysis ... with a wary eye"). Second, the testimony of defendants' witnesses is no more persuasive today than it was in 1981. *See* 517 F.Supp. at 887. Finally, it is to be noted that, while the *prima facie* case defendants would now have to rebut is somewhat weaker than the case they sought to rebut in 1981, it is not a great deal weaker, in light of *Bazemore* and the other considerations discussed above.

For the reasons stated, and taking due consideration of the Court's longstanding, and intimate, familiarity with the voluminous, thirteen-year record and the 1981 trial, the Court concludes that defendants are guilty of intentional discrimination in promotions against the plaintiff class, in violation of Title VII. *See U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. at 711, 103 S.Ct. at 1478.

Judgment in favor of the plaintiff class will be entered and the parties will be instructed to appear for a status hearing to address the question of proper relief.

evidence for failing to consider pre–1972 and      outside agency placement data.